**IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS,
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| SHERRY SUMMERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-cv-3135 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Sherry Summers appeals from the denial of her application for Social Security Disability Insurance Benefits under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. §§ 405(g). Summers filed her Brief in Support of Motion for Summary Judgment (d/e 14), and the Defendant Commissioner of Social Security has filed his Motion for Summary Affirmance (d/e 17). The parties consented, pursuant to 28 U.S.C. § 636(c), to have this matter proceed before this Court. Consent to Proceed Before a United States Magistrate Judge, and Order of Reference entered October 4, 2011 (d/e 12). For the reasons set forth below, the Decision of the Commissioner is affirmed.

<u>STATEMENT OF FACTS</u>

Summers was born on July 18, 1961.  She graduated from high school and was fifteen hours shy of completing her bachelor's degree.  She had work experience as a certified nurse's assistant, a baker, and a room service assistant.  <u>Answer to Complaint (d/e10)</u>, attached <u>Certified Transcript of Record of Proceedings Before the Social Security Administration (R.)</u> 32, 185, 197.  On October 23, 2005, she was injured in an accident at work at the Illinois Veteran's Home in Quincy, Illinois.  R. 27.  She injured her back and right elbow in the accident.  She went to the emergency room at Blessing Hospital in Quincy, Illinois.  R.  252-56.  X-rays of her back and right elbow showed no fractures or dislocations.  The x-rays of her back showed some degenerative changes but normal alignment of her lumbar vertebral bodies and no subfluxation.  R. 262-63.  She was diagnosed with a contusion of her back and elbow.  R. 254.  The emergency room doctor issued a Work Ability Report.  R. 258-59.  The Report stated that Summers could return to work on October 24, 2025, but could not lift, push, or pull more than fifteen pounds and could not perform work requiring repetitive bending of her elbow or back.  R. 258.

On October 26, 2005, Summers saw Dr. David Arndt, D.O. on a workers compensation referral from her employer.  Dr. Arndt diagnosed Summers with a contusion of her elbow and back and muscle spasms.

R. 365.  Dr. Arndt prescribed an NSAID anti-inflammatory Relafen and a muscle relaxer Skelaxin, and recommended physical therapy.  R. 365. Summers saw a physical therapist the next day.  The therapist noted that Summers had limited ability to stand erect, bend forward, and lift due to back pain.  Summers also reported pain while lifting with her right arm. Summers rated the pain in her elbow at a 5 on a scale of 1 to 10 with an ache and elbow pain increasing to an 8 when lifting.  She rated the pain in her back as a 3.  R. 362.

Summers saw Dr. Arndt again one week later on November 2, 2005. Summers stated that the therapy caused pain in her elbow.  R. 359. Dr. Arndt ordered an MRI of Summers' right elbow.  The MRI showed a small amount of fluid in the joint, but was otherwise unremarkable.  R. 357.

Summers also saw Dr. Ann Roberson, D.O., on November 2, 2005. Summers rated her back pain at a 2 on a scale of 1 to 10.  She stated that her right elbow had no pain unless she used it.  She stated that the physical therapy helped her back, but caused a burning sensation in her elbow.  R. 353.  Dr. Roberson found that Summers had full range of motion in her elbow with some mild swelling, and full range of motion in her spine with mild discomfort.  R. 353.  Dr. Roberson diagnosed contusion and strain of the right elbow and lumbar spine, resolving.  R. 353.  Dr. Roberson prescribed an NSAID Celebrex and a muscle relaxer Flexeril and

recommended alternating applications of heat and ice.  She stated that Summers could return to work with light duty restrictions.  R. 353.

Summers saw Dr. Roberson again on November 11, 2005. Summers told Dr. Roberson that she felt better and that her injuries were okay if she was not doing anything.  R. 351.  Summers rated her pain in her back as a 3 or 4.   Dr. Roberson reported mild swelling over her right elbow with good rotation and moderate lumbar swelling possibly suggesting overuse of a heating pad.  R. 351.  Dr. Roberson told Summers to stop the muscle relaxer and prescribed an NSAID Naprosyn.  R. 351. Dr. Roberson stated that it was appropriate for Summers to return to light duty work with no lifting more than ten pounds in the right arm, no pushing or pulling more than twenty pounds and only limited use of the right elbow and lifting.  R. 352.

On November 21, 2005, Summers saw Dr. Roberson again. Dr. Roberson noted that Summers was compliant with medication and physical therapy and was somewhat better.  Summers rated her pain as a 2 or 3 at most when trying to lift.  Summers reported some discomfort, but only when she was trying to lift.  Summers reported that she felt more of a

stiffness now and the pain had not exceeded a 3 for some time.

Dr. Roberson discharged Summers to full regular duties. R. 343.

Summers was also discharged from physical therapy November 21, 2005. Summers told her physical therapist that her pain was a 3 in her elbow and back. Summers reported good compliance with a home exercise program at the time of discharge. R. 336.

The next day, November 22, 2005, Summers went to see Dr. Lee Huang, M.D., her primary care physician. She reported having continuing back and elbow pain. Dr. Huang prescribed a narcotic analgesic Hydrocodone. Dr. Huang limited Summers to light duty and restricted her to lifting no more than fifteen pounds. R. 403.

On March 8, 2006, Dr. Joshua Warach, M.D., saw Summers for a neurologic consultation. She reported that she continued to have persistent constant pain in her elbow and persistent intermittent pain in her back. She reported that the back pain radiated into her left hip and down her left leg. Summers reported that she had a cortisone injection in her elbow four days earlier. She reported that since the injection, her pain was 80 percent better. R. 294. Summers reported that her leg and back pain had not improved since her accident. On examination, Dr. Warach found that Summers' mental status, cranial nerves, sensory motor, cerebellar function and gait were normal; he found no abnormal involuntary

movements, tremors, or seizure activity; and he found 5/5 strength in all groups in all four extremities.  R. 294.  Dr. Warach stated that Summers should avoid heavy lifting, strain, and other provocative activities.  R. 295.

Dr. Warach ordered x-rays and an MRI of Summers' back.  The x-ray of her lower back showed mild degenerative changes and no acute abnormalities.  The x-ray of her pelvis and bilateral hips revealed no significant abnormalities.  The MRI of her lumbar spine showed some degenerative changes including mild to moderate disc bulges and lateral disc protrusions.  R. 274-76.

On March 29, 2006, and March 30, 2006, Summers underwent EMG/nerve conduction studies.  The studies showed evidence of left L4 radiculopathy in her lower extremities with possible involvement of the left L2 and L3 roots.  Dr. Warach ordered one to two months of additional therapy, and stated that Summers should remain on light duty work with no heavy lifting, strain, or other provocative activities, as tolerated for three months.  At Summer's request, Dr. Warach gave her a note limiting her to light duty with no heavy lifting, strain or other provocative activities for three months.  R. 290-91.

On April 5, 2006, Summers underwent a physical therapy evaluation.  She reported low back pain.  She stated that her worst symptom was left hip pain which occasionally radiated into the front of the thigh.  She

described the pain as a deep boring pain. Summers rated her hip pain as a 9 at worst on a 1 to 10 scale. The therapist noted tenderness to palpation from the L-5 to S-3 area of the spine on the left side. Summers' walking was stiff and guarded. Summers had 5/5 strength in her extremities except for 4+/5 strength in the left hip flexion and left hamstring, and her gait was independent but with decreased truncal rotation. Summers was assessed with a good rehabilitation potential and given a therapy plan of three sessions a week for four weeks. R. 248-49.

Summers saw Dr. Warach again on May 1, 2006. She told Dr. Warach that she had no elbow pain after a cortisone shot. Dr. Warach stated that therapy also eliminated the pain radiating into her leg. Summers still complained of back pain that radiated into her left hip. She said that the physical therapy had not helped her back pain, but not her left hip pain. R. 288. Dr. Warach found that Summers' strength was 5/5 in all four extremities, and her ambulation was normal and independent. Summers was not taking any medication at this time. Dr. Warach prescribed an NSAID Ibuprofen, a muscle relaxer Chlorzoxazone, and Neurontin to relieve neuropathic pain. Dr. Warach limited her to light duty work with not heavy lifting, strain, or other provocative activities. Summers informed Dr. Warach that she had been sent home from work because her employer did not have any light duty work for her to perform. R. 288.

Summers saw Dr. Warach again on June 29, 2006. Dr. Warach reported that Summers had completed a series of three lumbar epidural injections for pain and two injections in her left hip. Summers reported that her lumbosacral pain with radiation was 95 percent better relative to time of onset. Dr. Warach again stated that Summers should avoid heavy lifting, strain, and other provocative activities. Dr. Warach stated that Summers could perform light duty work. Dr. Warach discontinued the Neurontin because Summers reported that the medication caused headaches. Dr. Warach continued the Ibuprofen and Chlorzoxazone prescriptions and ordered a TENS unit for pain. He referred Summers to a neurosurgeon, Dr. Terrence Pencek, M.D., for a surgical consultation. R. 284.

Summers went to see Dr. Roberson again on July 26, 2006. Summers reported low back pain and left hip pain, which she rated at a 3 to 4 pain level. R. 332. Dr. Roberson found full range of motion, normal strength, normal gait, and no evidence of radiculopathy. Dr. Roberson diagnosed Summers with status post fall with contusion to the right elbow and stain to the left hip and lower back. Dr. Roberson stated that Summers could return to work and was close to maximum medical improvement. R. 333.

On July 31, 2006, Summers saw both Dr. Warach and Dr. Pencek. She saw Dr. Pencek first. Dr. Pencek found that Summers exhibited

tenderness to the left sacroiliac joint. Dr. Pencek also found that straight leg testing was normal, her strength was normal, her gait was steady, and she was able to heel and toe walk. Dr. Pencek recommended conservative therapy and against surgery. R. 321-22. Summers then saw Dr. Warach. Summers told Dr. Warach that her pain had reached a plateau of 95 percent improvement. She reported that the TENS unit was providing significant and definite benefit. Her gait and strength was normal. She was continued to take the Ibuprofen and Chlorzoxazone with no reported side effects. R. 282.

On August 30, 2006, Summers saw Dr. Warach again. Summers had undergone a nerve root block on August 4, 2006. R. 281. Summers stated that she was 99 percent better after the root block. She had normal strength in all extremities and normal independent ambulation. Dr. Warach was pleased with her clinical progress. Dr. Warach continued to recommend light duty work with no heavy lifting. Dr. Warach noted that Summers was still off work because her employer could not accommodate the light duty restrictions. Dr. Warach ordered a functional capacity evaluation. R. 281.

Summers underwent a functional capacity evaluation on September 19-20, 2006. Summers demonstrated subjective tolerances at the light to medium physical demand level. R. 303. Summers reported her pain as a

2 on a 0 to 10 scale.  R. 305.  The evaluation indicated that Summers could sit, stand, or walk for one to three hours with intermittent change of position, could occasionally lift forty-three pounds in the range of ten inches off the ground to her waist, occasionally lift fifteen pounds knuckle to shoulder, occasionally lift fifteen pounds knuckle to overhead; and occasionally bend, climb stairs, reach, squat, and kneel.  R. 304.

On October 31, 2006, Summers saw Dr. Pencek again to see if surgery could help her condition.  After discussing the risks, Summers decided against surgery.  R. 319-20.

On February 13, 2007, Dr. Roberson reviewed the functional capacity evaluation and opined that Summers could return to work if she did not have to lift more than twenty pounds or push or pull more than forty pounds.  R. 327.

On April 26, 2007, Summers went to see Dr. Huang.  Summers complained of continuing pain.  Dr. Huang renewed the prescription for Hydrocodone for pain.  R. 407.  Dr. Huang continued to prescribe Hydrocodone for Summers through January 2008.  R. 407-10.

On June 24, 2008, Dr. Huang wrote a letter.  The letter stated that Summers had been treated by Dr. Warach and with epidural steroid injections, but her back pain persisted.  He stated that functional tests indicated that she had limited working capacity.  R. 402.

On August 16, 2008, Summers underwent a consultative examination by Dr. Raymond Leung, M.D. R. 426-31. Summers told Dr. Leung that her main problem was back and left hip and leg pain. She stated that physical therapy did not help, but steroid injections had helped. She stated that her pain medication also helped. R. 426. She reported that she was currently taking Ibuprofen, Chlorloxazone, and Hydrocodone. Dr. Leung noted that Summers did not use a cane or walker to ambulate. He found that her gait was within normal limits, she could walk fifty feet unassisted, tandem walk, heel walk, toe walk, squat and hop. He found decreased range of motion in her lumbar spine but no muscle atrophy or spasms. Straight leg raising was to seventy degrees with the left leg and ninety degrees with the right. Her strength was 5/5 throughout. He sensations were within normal limits. He noted that extension of her spine was limited to five degrees with lateral bending to the right limited to twenty degrees. Dr. Leung stated that Summers had a history of lumbar disc disease, mild kyphosis, and mild scoliosis. R. 427-28.

On August 28, 2008, state agency physician Dr. Ernst Bone, M.D. reviewed Summer's medical records and completed a form called an Illinois Request for Medical Advice. R. 432-34. Dr. Bone found that Summers had mild kyphosis and mild scoliosis and opined that Summers' impairments were not severe. R. 432. On October 9, 2008, state agency

physician Dr. Calixto Aquino, M.D., also completed an Illinois Request for Medical Advice form.  R. 451-43.  Dr. Aquino affirmed Dr. Bone's opinions.  R. 452.  Dr. Aquino opined Summers' impairments were non-severe.  R. 453.

On October 13, 2009, Summers saw Dr. M. Kim, M.D.  Summers told Dr. Kim that she was disabled due to back pain.  Summers stated that she could not work due to her limitations on standing, sitting, and lifting.  R. 459.  Dr. Kim found that Summers had pretty good range of motion in all four directions, and her strength was equal and full bilaterally.  Dr. Kim noted a positive raised leg test on the left.  R. 459.  Dr. Kim diagnosed Summers with chronic low back pain and muscle spasms and prescribed Lortab, a narcotic analgesic.  R. 459.

The Administrative Law Judge (ALJ) conducted a hearing on January 20, 2010, by video conference.  R. 23-72.  Summers appeared with her attorney in Hannibal, Missouri.  The ALJ was in Chicago, Illinois.  Vocational expert Charles H. McBee also appeared at the hearing by telephone.  At the beginning of the hearing, Summers amended her alleged onset date from October 23, 2005, to April 1, 2006.  R. 25.

Summers testified at the hearing.  She testified that she hurt her elbow, hip, and back in the October 23, 2005, accident at work.  She was working as a certified nurse's assistant at the Illinois Veterans' Home when

the accident occurred.  R. 27.  She continued to work from October 2005 to April 1, 2006, but she was off frequently.  R. 26.  Summers explained that she broke out in a sweat, felt hot, and started seeing black when she tried to work.  Summers stated that she thought she was going to pass out. R. 26.  Summers resigned on April 1, 2006, but her employer tried to assist her finding other work through two different job agencies.  R. 27.

After leaving the Illinois Veterans' Home, Summers tried to find work. She worked briefly for a sandwich shop.  She was operating a meat slicer. She stated that she could not perform the job because her medications made her shaky, her motor skills were slow and she was required to stand and could not lean on the counter.  She was let go from this job.  R. 27.

She then tried working at a hotel as a night auditor.  She testified that she could not perform the job because she was required to drive to the train station to pick up guests and she could not drive because of her medications.  R. 28-29.  She also was required to carry items, such as microwave ovens or small televisions, to hotel rooms as part of the job, and she could not carry these items.  R. 44.

Summers testified that she suffered from severe left hip pain and leg pain.  She testified that her leg did not feel like it is in its socket.  She stated that she lost control of her leg and sometimes fell.  She also suffered from spasms in the leg.  She stated that while standing or sitting she felt pain

that went up to her neck and gave her a headache and made her throw up. She testified that she got "deathly sick."  R. 29.

Summers testified that the pain was constant.  She said the hip felt like it was not connected.  She said, "It is off a socket and feels like you're punching a bone or you're pulling a bone out of socket and then, when they did all my testing, I had fell 1/4 inch on one side, so I do not have bone rubbing bone. So every time I take a step, I'm actually sideways."  R. 30.

Summers testified that the steroid shots helped with the pain, but she was at her limit and could not receive any more shots.  She said that she used a heating pad and medication to relieve the pain.  She also took several baths a day.  She said, "The pain is not something that goes away but it could be a little bit more controllable.  It's kind of like an arthritis or toothache, something that you can feel it in your bones."  R. 30.

Summers testified that she sometimes got headaches almost every day.  She said that the headaches sometimes would last for two days.  She also testified that her eyes swelled.  R. 30.  Summers said that the headaches made her nauseous when the pain level got too high.  She said, "I get shooting pains up my spine through my head and they make me nauseous."  R. 51.  She said that Codeine and Ibuprofen sometimes helped.  Sometimes she took a hot bath and lay down.  She testified that the Neurontin made the headaches worse.  R. 51.

Summers testified that she also got dizzy.  She said that she sometimes would feel a sweat coming on and would get a ringing in her ears and start to see black.  She said that she must stand perfectly still to handle these feelings.  R. 31.  Summers testified that she also had trouble sleeping because she got leg spasms.  She said that sometimes the muscle relaxer worked on the spasms, but sometimes not.  R. 31.

Summers testified that she was taking Ibuprofen, Codeine and a muscle relaxer at the time of the hearing.  R. 52.

Summers testified that she could sit for three hours in an eight-hour day, but she would need to change positions often, every forty-five minutes.  R. 45-46.  She said that she could only stand for five minutes.  R. 48.  Summers said that she could walk for ten minutes.  R. 48.  Summers said that she could lift forty-three pounds up or down ten inches from waist level.  She agreed that she could lift fifteen pounds occasionally and carry twenty-five pounds fifty feet.  R. 49-50.

Vocational expert McBee then testified.  The ALJ asked McBee,

So Mr. McBee, if you need to change your positions, one to three in the one to three hours of sitting, if you need to lean on something when you stand one to three hours, but can walk one to three hours and lift up to 43 pounds and have that headache, which means you have to lie down either two hours or four to five hours, at least three times, at unpredictable times, in a month and . . . have her education and she is 49 . . . can that person do past work or other work in your opinion, sir?

R. 63-64.  McBee opined that such a person could not work.  R. 65.

The ALJ then asked McBee to assume the person could perform sedentary work, but would be absent one day a month.  McBee opined that such a person could perform Summers' past sedentary work and other sedentary work.  R. 65-66.

The ALJ then asked McBee to assume the person could perform sedentary work that was limited to one to three hours sitting, one to three hours standing, one to three hours walking, and lifting forty-three pounds, and was also absent from work one day a month.  The ALJ further stated that the hypothetical person needed to move and change positions regularly.  R. 66  McBee stated that the person would be limited to less than sedentary work because of the additional limitations.  He opined that such a person could not perform Summers' past work.  R. 67.

The ALJ then asked McBee whether a person who was limited to sedentary work with a sit/stand option could perform Summers' past work. McBee opined that the person could perform the night audit clerk job.  He opined that the person could not perform the driving duties that were part of the job that Summers worked.  R. 68.  He also opined that such a person could perform other jobs such as receptionist or information clerk.  R. 68. McBee opined that 6,000 receptionist jobs existed in Illinois and 400,000

nationally.  R. 68.  He opined that 2,000 information clerk jobs existed in Illinois and 75,000 nationally.  R. 69.

McBee stated that the Department of Labor's <u>Dictionary of Occupational Titles</u> (DOT) did not mention a sit/stand option for these jobs. He opined that these jobs had a sit/stand option based on his knowledge and experience of how these jobs are performed.  R. 70-71.   The ALJ then concluded the hearing.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued her decision on February 8, 2010.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of the claimant's age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant's condition or combination of conditions must meet the criteria for one of the conditions set forth in the Listings or be equal to the criteria in one of the Listings.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the claimant not to be able to return to her prior work considering her Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Summers met her burden as Steps 1 and 2. Summers was not engaged in substantial gainful activity and she suffered from severe impairments of a contusion to her right elbow, chronic back pain with radiation into the left leg, lumbar disc disease, mild kyphosis and mild scoliosis. R. 9. At Step 3, the ALJ found that Summers' impairments did not meet or equal any Listing. R. 10.

At Step 4, the ALJ found that Summers had the RFC to perform sedentary work except that she required a sit/stand option. R. 10. In

reaching this conclusion, the ALJ relied on the opinions of Drs. Warach, Roberson, Bone, and Aquino, as well as the consultative examination by Dr. Leung and the functional capacity evaluation performed in 2006. The ALJ noted that several doctors at various points in time stated that she could perform light work or released her to work. R. 12-16.

The ALJ found that Summers' testimony about the intensity, persistence and limiting effects of her pain and other symptoms was not credible to the extent the testimony was inconsistent with the ALJ's RFC assessment. R. 11. The ALJ stated that,

> The claimant described severe pain and even said it made her "deathly sick." However in the treatment notes the claimant's doctors reported she was doing much better and was not having any severe pain. Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

R. 16. Based on the RFC and the opinions of McBee, the ALJ determined at Step 4 that Summers could not perform her past relevant work.

The ALJ determined at Step 5 that Summers could perform other jobs in the national economy. The ALJ relied on the Medical-Vocational Rules (20 C.F.R. Part 404, Subpart P, Appendix 2) and McBee's opinion that a person with Summers' age, education and experience and RFC

could perform the reception and information clerk jobs.  R. 16-17. The ALJ

then concluded that Summers was not disabled.

Summers appealed to the Social Security Appeals Council.  The

Appeals Council denied Summers' request for review on March 18, 2011.

R. 1.  Summers then brought this action for judicial review.

ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is

supported by substantial evidence.  In making this review, the Court

considers the evidence that was before the ALJ.  Wolfe v. Shalala,

997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate" to

support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the ALJ's findings if they are supported by

substantial evidence, and may not substitute its judgment for that of the

ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must

articulate at least minimally her analysis of all relevant evidence.  Herron v.

Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track"

the analysis to determine whether the ALJ considered all the important

evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ's decision is supported by substantial evidence.

Drs. Warach, and Roberson concluded that Summers could perform light

work with few restrictions.  Drs. Bone and Aquino opined that her impairments were not severe.  The ALJ also relied on the consultative examination of Dr. Leung.  This medical evidence, along with Summers' age, education, and work history supported the ALJ's determination at Steps 1-4 of the Analysis, including the ALJ's determination of Summers' RFC.  The opinion of McBee supported the finding at Steps 4 and 5 that Summers could not perform her past work, but could perform a significant number of jobs in the national economy.

Summers argues that the ALJ erred by not providing a sufficient explanation of all the relevant impairments, including Summers' headaches and the side effects of her medication, as required by SSR 96-8p.  The ALJ referenced the headaches and claims of side effects.  <u>See</u> R. 11, 15-16. The ALJ, however, did not include them in Summers' severe impairments.

The ALJ's decision not to consider Summers' claims of headaches or side effects from medication in the Analysis is supported by substantial evidence.  The ALJ correctly stated that the medical records did not corroborate Summers' allegations of side effects from medication.  R. 16. The Court could find one reference to headaches or side effects in the medical records.  In June 2006, Summers told Dr. Warach that the Neurontin gave her headaches.  Dr. Warach discontinued the medication. Summers fails to cite any other reference in her medical records in which

she complained about headaches. Summers also did not cite any other evidence in which she reported any other side effects from any of her medications to any of her doctors. The ALJ's decision not to credit Summers' testimony about headaches and side effects was consistent with the ALJ's credibility findings. As discussed below, those credibility findings are supported by the record.

Summers also complains the ALJ did not perform a function-by-function assessment of her ability to work. The RFC assessment is a function-by-function assessment. SSR 96-8p. The ALJ, however, is not required to articulate the assessment function-by-function. The ALJ may use a narrative discussion of the claimant's symptoms and medical assessment. Bayliss v. Barnhart, 427 F.3d 1211, 1217 (7th Cir. 2005); Knox v. Astrue, 327 F.App'x 652, 656 (7th Cir. 2009). The ALJ did so here. The ALJ adequately explained that her findings were supported by the medical evidence. See R. 11-16.

Summers complains that the ALJ should have included in the RFC the frequency with which the person with the sit/stand option must be allowed to alternate between sitting and standing. The Court disagrees. McBee defined the sit/stand option as the ability to change positions at will. R. 70. He opined that the receptionist and information clerk positions would allow such a sit/stand option. Based on this evidence, the ALJ was

not required to state the frequency of changing positions in a sit/stand

option because the jobs at issue allowed frequent changes of positions.

See Ketelboeter v. Astrue, 550 F.3d 620, 626 (7th Cir. 2008) (ALJ is not

required to define frequency of changing positions when the jobs at issue

allowed for frequent standing and sitting).

Summers also argues that the ALJ's RFC findings were not

supported by the opinions of vocational expert McBee.  The Court

disagrees.  McBee opined that a person with Summers' age, education and

work experience and an RFC to perform sedentary work with a sit/stand

option could perform 400,000 receptionist jobs and 75,000 information

clerk jobs that exist in the national economy.  R. 68-69.  Those opinions

supported the ALJ's findings at Step 5 that Summers could perform a

substantial number of jobs that exist in the national economy.

Finally, Summers argues that the ALJ's credibility findings were not

supported by substantial evidence.  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008).  In this case, ample evidence exists in the record to support the

ALJ's credibility finding.  Summers testimony was inconsistent with her

medical records.  Summers testified that she had excruciating constant

pain, but the medical records indicated that her pain was largely resolved.

On April 5, 2006, Summers told the physical therapist that her pain was a 9 on a scale of 1 to 10. R248-49. That is the only place in the record that the Court could find that supported her claims of pain. Otherwise, she reported to her doctors that her pain was to a 2 or a 4. By August 2006, she reported that the injections, the root block and the TENS unit had made her 99 percent better. R. 281. By September 2006, she reported that her pain was down to a 2 on a scale of 0 to 10. Her testimony about her pain was inconsistent with this evidence in the medical record. Summers also testified extensively about her headaches, but she presents no evidence that she reported these headaches to her doctors. The only evidence that the Court found was Dr. Warach's note in June 2006 that the Neurontin was causing headaches, and Dr. Warach discontinued the medicine. Summers cites no references to headaches in the medical evidence. The lack of evidence that she reported headaches to her numerous doctors further supports the ALJ's decision not to credit her testimony. The ALJ's credibility finding is upheld.

WHEREFORE the Plaintiff Sherry Summers' Brief in Support of Motion for Summary Judgment (d/e 14) is DENIED, and the Defendant Commissioner's Motion for Summary Affirmance (d/e 17) is ALLOWED.

The decision of the Commissioner is AFFIRMED.  All pending motions are denied as moot.  THIS CASE IS CLOSED.


ENTER:   May 7, 2012


_____*s/ Byron G. Cudmore*_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE